# Exhibit 1

1 February 2000

Mr Anthony Derubeis
Danbury, Connecticut

Dear Mr Derubeis,

**WITTEN**
**TECHNOLOGIES INC**

It is a pleasure to offer you a position as Senior Engineer of Witten Technologies, Inc (the "Company") on the terms and conditions hereinafter set forth. In this position, you will be reporting to Michael Oristaglio, Chief Scientist. Your starting date is 1 March 2000.

The Company is a small, privately held company, which was incorporated in October 1994 in the State of Florida. The Company is involved in the development of methods for imaging the shallow subsurface (to depths of about 50 meters), including detecting and locating buried utilities and other objects located under the near surface of land or bottom of the ocean (the "Technology"). The Company is interested in all commercial applications of images and maps of the shallow subsurface, including engineering, construction, environmental assessment, archaeology, resource management, and law enforcement (the "Fields of Interest").

The following paragraphs set forth the terms of your employment with the Company:

1. _Compensation._ Your salary will be $80,000 per year, paid monthly. You will also receive a vehicle allowance of $400 per month. Barring a change in your position, your next salary review will be January 2002. You will receive 4 weeks paid vacation annually, sick days as medically necessary, all Federal holidays and two personal holidays.

2. _Location and Work._ The Company is engaging you and you agree to be engaged by the Company to provide professional services related to the development or improvement of Technology in the Fields of Interest. The Company's technology offices are currently located at 295 Huntington Avenue, Boston, Massachusetts 02115. The Company also has offices at 2121 K St NW, Washington, DC 20037.

    Recognizing that the Company's business, research, and development of technology does not require you to maintain a physical location at its offices during work, the Company allows flexible working hours and telecommuting. Recognizing that you are on salary, you agree to use your best efforts to respond to requests for your services by the Company and that you will have no other full-time employment that will limit your availability to provide services. Nevertheless, unless otherwise agreed in writing with the

2121 K STREET, NW
SUITE 650
WASHINGTON, D.C.
20037
PHONE 202 728 2200
FAX 202 728 2210
WITTENINC@AOL.COM

your individual goals for the year and (b) a grant of up to 75% of your total eligible options will be based on the Company's performance against its business goals for the year. You and the Chief Scientist of the Company will determine your individual goals no later than March 15 of each year. You will also participate in setting the Company's business goals which will be published to all employees by March 31.

8. *Additional Payments.* You will be entitled to receive the following additional payments from the Company:

  (a) Within fifteen (15) days following the date you sell or otherwise dispose of any of the Initial Option Shares (including, without limitation, as a result of a liquidation), the Company shall pay to you an amount equal to $2 per Initial Option Share sold or otherwise disposed of at such time.

  (b) If Robert Green, Alan Witten, Anthony Devaney and/or Shane Green (the "Founders") sell or otherwise dispose of any of the 3,600,000 shares of common stock they currently hold in the Company (the "Founders Shares") in a fully or partially taxable transaction (including, without limitation, as a result of a liquidation) and are entitled to receive $2 or less per share, then, within fifteen (15) days following such sale or other disposition, the Company will pay to you an amount equal to the product of (x) the amount per share the Founders are entitled to receive from such sale or other disposition, (y) the number of your Initial Option Shares set forth in paragraph 6 above and (z) a fraction, the numerator of which is the number of Founders Shares sold or otherwise disposed of in the transaction and the denominator of which is the total number of Founder Shares.

  (c) The maximum amount you may receive in the aggregate under paragraphs (a) and (b) is $2 times the number of Initial Option Shares.

  (d) At the time of any payment to you under clause (a) or (b) above, the Company shall pay an additional amount equal to the product of (i) the amount received by you under clauses (a) and (b) above, and (ii) a fraction, the numerator of which is equal to the excess of the maximum marginal federal income tax rate imposed on ordinary income at such time (the "Ordinary Income Rate") over the maximum marginal federal income tax

Derubeis
1 February 2000
Page 4

rate imposed on long-term capital gains at such time, and the denominator of which is equal to one (1) less the Ordinary Income Rate.

(e) For purposes of this paragraph, the number of shares of Company stock and the price per share shall be equitably adjusted to reflect any stock splits, stock dividends, recapitalizations or similar transactions.

9. *Professional Activities.* The company recognizes that, as a engineer, your participation in scientific or engineering meetings and conferences and on academic or government review committees or panels is important to your professional development. The Company encourages your participation in such activities, provided they do not conflict with the Company's business. The Company agrees to reimburse reasonable and necessary expenses related to your participation in such activities in accordance with its customary policies. You agree to inform the Company of any requests for your participation.

The Company will also pay tuition, fees, and books for approved courses related to your employment.

10. *Project Discoveries.* During your employment with the Company, you agree to disclose promptly to the Company, or any person designated by it, any improvements, discoveries, inventions, whether patentable or not, trade secrets, formulae, processes, techniques, and other developments and advances using physical (e.g., electromagnetic, acoustic, gravity, nuclear, magnetic resonance) or chemical measurements in the Fields of Interest.

11. *Confidentiality.* You agree to hold for the benefit of the Company all secret or confidential information, knowledge or data relating to the Company or any of its affiliates, and their respective businesses, which shall have been obtained by you during your employment by the Company and which shall not be or become public knowledge (other than acts by you or representatives of you in violation of this Agreement). You agree that you will not, without the prior written consent of the Company or as may be otherwise required by law or legal process, communicate or divulge any such secret or confidential information, knowledge or data relating to the Company or any of its affiliates and their respective businesses to anyone other than the Company and those designated by it.

12. *Term.* Unless terminated earlier pursuant to the terms of this letter agreement, the term of your employment will be 24 months from the starting date, ie, from 1 March 2000 to 28 February 2001. The Company agrees to start negotiations with you in good faith on a

new employment agreement no later than 18 months following the starting date. If negotiations on the terms of a new employment agreement are not concluded by the end of the term, you will have the option of continuing your employment under the terms of this agreement for an additional 6 months.

In the event the Company terminates your employment without "Cause" (as defined below) or in the event of your death or Disability (as defined below) (a) during the first 12 months of employment with the Company, you will be entitled to receive a lump-sum payment equal to 12 months salary; or (b) after your first 12 months of employment, you will be entitled to receive a lump-sum payment equal to the remainder of the term of your contract or 6 months' salary, whichever is greater. In return for this consideration, you agree in the event of your termination by the Company without Cause not to accept employment or render service to any person engaged in a business directly competitive with the business then engaged in by the Company or any of its affiliates for a period starting at your termination date and ending that number of months after the termination of your employment that is equivalent to the number of months taken into account in computing your final lump sum payment (e.g., if your termination date is 1 January 2001 and your final lump-sum payment is 12 months salary, you will agree to refrain from competition with Company until 1 January 2002).

For purposes of this letter agreement, "Disability" means your inability, due to illness, accident or any other physical or mental incapacity, to substantially perform your duties for a period of ninety (90) consecutive days or for a total of one hundred fifty (150) days (whether or not consecutive) in any twelve (12) month period.

13. _Termination._ Except as otherwise provided herein, the Company shall have the right to terminate your employment only for Cause. "Cause" shall mean willful and persistent inattention to duties, any act amounting to gross negligence to the substantial detriment of the Company, intentional engaging in activity which is in direct conflict with the interests of the Company, willful and serious misconduct to the substantial detriment of the Company, acceptance of a position with another employer in contravention of this letter agreement without the consent of the Company, or any other substantial breach of any material term or provision of this agreement that is not cured within 10 days after written notice from the Company.

14. _Miscellaneous._ This letter agreement shall be governed by the laws of the State of Massachusetts without regard to its principles of conflicts of law. This letter agreement may be executed in one or more together will constitute one agreement. The rights and obligations of the Company hereunder may be assigned by the Company in connection with a sale of all or substantially all of the assets of the Company. This letter agreement

Derubeis
1 February 2000
Page 6

constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes any prior agreement or understanding between them with respect to the subject matter hereof.

Please acknowledge your acceptance of this agreement by signing where indicated below.

Very truly yours

WITTEN TECHNOLOGIES

By _____
Robert Green, President

ACKNOWLEDGED AND AGREED

_____
Anthony Derubeis

Date __04/25/00__

# Exhibit 2

1 February 2000

Mr Maclyn Burns
Danbury, Connecticut

Dear Mr Burns,

**WITTEN**
TECHNOLOGIES INC

It is a pleasure to offer you a position as Senior Engineer of Witten Technologies, Inc (the "Company") on the terms and conditions hereinafter set forth. In this position, you will be reporting to Michael Oristaglio, Chief Scientist. Your starting date is 1 March 2000.

The Company is a small, privately held company, which was incorporated in October 1994 in the State of Florida. The Company is involved in the development of methods for imaging the shallow subsurface (to depths of about 50 meters), including detecting and locating buried utilities and other objects located under the near surface of land or bottom of the ocean (the "Technology"). The Company is interested in all commercial applications of images and maps of the shallow subsurface, including engineering, construction, environmental assessment, archaeology, resource management, and law enforcement (the "Fields of Interest").

The following paragraphs set forth the terms of your employment with the Company:

2121 K STREET, NW
SUITE 550
WASHINGTON, D.C.
20037
PHONE 202 728 2030
FAX 202 728 2210
WITTEN-NA@AOL.COM

1. *Compensation.* Your salary will be $80,000. per year, paid monthly. You will also receive a vehicle allowance of $400 per month. Barring a change in your position, your next salary review will be January 2002. You will receive 4 weeks paid vacation annually, sick days as medically necessary, all Federal holidays and two personal holidays.

2. *Location and Work.* The Company is engaging you and you agree to be engaged by the Company to provide professional services related to the development or improvement of Technology in the Fields of Interest. The Company's technology offices are currently located at 295 Huntington Avenue, Boston, Massachusetts 02115. The Company also has offices at 2121 K St NW, Washington, DC 20037.

   Recognizing that the Company's business, research, and development of technology does not require you to maintain a physical location at its offices during work, the Company allows flexible working hours and telecommuting. Recognizing that you are on salary, you agree to use your best efforts to respond to requests for your services by the Company and that you will have no other full-time employment that will limit your availability to provide services. Nevertheless, unless otherwise agreed in writing with the

Burns
1 February 2000
Page 2

Chief Scientist of the Company, the Company expects that you will be physically present at one of its offices no fewer than 6 working days per month. The Company will reimburse you for all reasonable and necessary business expenses in accordance with its customary policies. During the term of your employment, this reimbursement will include expenses related to your travel and accommodation for the 6 working days per month that you are required to be present at one of the Company's offices.

3. *Relocation.* The Company will reimburse your expenses related to one relocation of your residence to be more convenient to the Company's offices, in accordance with its customary new employee relocation policy (attached).

4. *Benefits.* In addition to the salary set forth in paragraph 1 above, each month a sum equal to 17% of monthly salary will be accrued into your flexible-benefits account, to be allocated according to your determination among (1) health care plans, (2) life and disability insurance plans, and (3) 401(k) plan. You will be asked to determine the amounts allocated to each plan within your first month of employment; these amounts will hold for the remainder of that calendar year. Near the end of each year there will be an open enrollment period of one month during which you can change the allocations for the next year.

As a regular full-time employee, you will be eligible to participate in any other benefit plans as established by the Company.

5. *Pension Plan.* You will be eligible to participate in a pension plan which will be established by the Company no later than January 1 of the year following its first receipt of revenues from commercial activities. Eligibility and vesting in the pension plan will be determined by your starting date (i.e., as if the plan had been in place at your starting date).

6. *Options.* On signing you will receive options to purchase 125,000 shares of the Company's Common Stock at a price of $2.00 per share under the terms of the attached Incentive Stock Option Agreement (the "Initial Option Shares"), which will be executed simultaneously with the execution of this letter agreement. The options granted under this paragraph 6 will not be subject to vesting.

7. *Performance-based Stock Incentive Plan.* You will be eligible immediately to participate in the Company's 2000 Stock Incentive Plan (attached). For each of your first 2 years of employment, the minimum number of options you will be eligible to be granted at the end of the year is 60,000 (as adjusted to reflect stock splits and other recapitalization events). The actual number granted will be based on your performance against your individual goals and the Company's performance against its business goals, as follows: (a) a grant of up to 25% of your total eligible options will be based on performance against

Burns
1 February 2000
Page 3

your individual goals for the year and (b) a grant of up to 75% of your total eligible options will be based on the Company's performance against its business goals for the year. You and the Chief Scientist of the Company will determine your individual goals no later than March 15 of each year. You will also participate in setting the Company's business goals which will be published to all employees by March 31.

8. *Additional Payments.* You will be entitled to receive the following additional payments from the Company:

   (a) Within fifteen (15) days following the date you sell or otherwise dispose of any of the Initial Option Shares (including, without limitation, as a result of a liquidation), the Company shall pay to you an amount equal to $2 per Initial Option Share sold or otherwise disposed of at such time.

   (b) If Robert Green, Alan Witten, Anthony Devaney and/or Shane Green (the "Founders") sell or otherwise dispose of any of the 3,600,000 shares of common stock they currently hold in the Company (the "Founders Shares") in a fully or partially taxable transaction (including, without limitation, as a result of a liquidation) and are entitled to receive $2 or less per share, then, within fifteen (15) days following such sale or other disposition, the Company will pay to you an amount equal to the product of (x) the amount per share the Founders are entitled to receive from such sale or other disposition, (y) the number of your Initial Option Shares set forth in paragraph 6 above and (z) a fraction, the numerator of which is the number of Founders Shares sold or otherwise disposed of in the transaction and the denominator of which is the total number of Founder Shares.

   (c) The maximum amount you may receive in the aggregate under paragraphs (a) and (b) is $2 times the number of Initial Option Shares.

   (d) At the time of any payment to you under clause (a) or (b) above, the Company shall pay an additional amount equal to the product of (i) the amount received by you under clauses (a) and (b) above, and (ii) a fraction, the numerator of which is equal to the excess of the maximum marginal federal income tax rate imposed on ordinary income at such time (the "Ordinary Income Rate") over the maximum marginal federal income tax

Burns
1 February 2000
Page 4

rate imposed on long-term capital gains at such time, and the denominator of which is equal to one (1) less the Ordinary Income Rate.

(e) For purposes of this paragraph, the number of shares of Company stock and the price per share shall be equitably adjusted to reflect any stock splits, stock dividends, recapitalizations or similar transactions.

9. *Professional Activities.* The company recognizes that, as a engineer, your participation in scientific or engineering meetings and conferences and on academic or government review committees or panels is important to your professional development. The Company encourages your participation in such activities, provided they do not conflict with the Company's business. The Company agrees to reimburse reasonable and necessary expenses related to your participation in such activities in accordance with its customary policies. You agree to inform the Company of any requests for your participation.

The Company will also pay tuition, fees, and books for approved courses related to your employment.

10. *Project Discoveries.* During your employment with the Company, you agree to disclose promptly to the Company, or any person designated by it, any improvements, discoveries, inventions, whether patentable or not, trade secrets, formulae, processes, techniques, and other developments and advances using physical (e.g., electromagnetic, acoustic, gravity, nuclear, magnetic resonance) or chemical measurements in the Fields of Interest.

11. *Confidentiality.* You agree to hold for the benefit of the Company all secret or confidential information, knowledge or data relating to the Company or any of its affiliates, and their respective businesses, which shall have been obtained by you during your employment by the Company and which shall not be or become public knowledge (other than acts by you or representatives of you in violation of this Agreement). You agree that you will not, without the prior written consent of the Company or as may be otherwise required by law or legal process, communicate or divulge any such secret or confidential information, knowledge or data relating to the Company or any of its affiliates and their respective businesses to anyone other than the Company and those designated by it.

12. *Term.* Unless terminated earlier pursuant to the terms of this letter agreement, the term of your employment will be 24 months from the starting date, ie. from 1 March 2000 to 28 February 2001. The Company agrees to start negotiations with you in good faith on a

Burns
1 February 2000
Page 5

new employment agreement no later than 18 months following the starting date. If negotiations on the terms of a new employment agreement are not concluded by the end of the term, you will have the option of continuing your employment under the terms of this agreement for an additional 6 months.

In the event the Company terminates your employment without "Cause" (as defined below) or in the event of your death or Disability (as defined below) (a) during the first 12 months of employment with the Company, you will be entitled to receive a lump-sum payment equal to 12 months salary; or (b) after your first 12 months of employment, you will be entitled to receive a lump-sum payment equal to the remainder of the term of your contract or 6 months' salary, whichever is greater. In return for this consideration, you agree in the event of your termination by the Company without Cause not to accept employment or render service to any person engaged in a business directly competitive with the business then engaged in by the Company or any of its affiliates for a period starting at your termination date and ending that number of months after the termination of your employment that is equivalent to the number of months taken into account in computing your final lump sum payment (e.g., if your termination date is 1 January 2001 and your final lump-sum payment is 12 months salary, you will agree to refrain from competition with Company until 1 January 2002).

For purposes of this letter agreement, "Disability" means your inability, due to illness, accident or any other physical or mental incapacity, to substantially perform your duties for a period of ninety (90) consecutive days or for a total of one hundred fifty (150) days (whether or not consecutive) in any twelve (12) month period.

13. *Termination*. Except as otherwise provided herein, the Company shall have the right to terminate your employment only for Cause. "Cause" shall mean willful and persistent inattention to duties, any act amounting to gross negligence to the substantial detriment of the Company, intentional engaging in activity which is in direct conflict with the interests of the Company, willful and serious misconduct to the substantial detriment of the Company, acceptance of a position with another employer in contravention of this letter agreement without the consent of the Company, or any other substantial breach of any material term or provision of this agreement that is not cured within 10 days after written notice from the Company.

14. *Miscellaneous*.    This letter agreement shall be governed by the laws of the State of Massachusetts without regard to its principles of conflicts of law. This letter agreement may be executed in one or more together will constitute one agreement. The rights and obligations of the Company hereunder may be assigned by the Company in connection with a sale of all or substantially all of the assets of the Company. This letter agreement

Burns
1 February 2000
Page 6

constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes any prior agreement or understanding between them with respect to the subject matter hereof.

Please acknowledge your acceptance of this agreement by signing where indicated below.

Very truly yours

WITTEN TECHNOLOGIES

By _____
Robert Green, President

ACKNOWLEDGED AND AGREED

_____
Maclyn Burns

Date 4/25/00

# Exhibit 3

Case 1:04-cv-11137-RWZ   Document 5-2   Filed 06/11/2004   Page 14 of 20

# WITTEN
TECHNOLOGIES INC

MICHAEL ORISTAGLIO
PRESIDENT

395 HUNTINGTON
AVENUE
SUITE 203
BOSTON, MA
02115
PHONE 617 236 0019
FAX 617 236 0032
WWW.WITTENTECH.COM
INFO@WITTENTECH.COM
M.ORISTAGLIO
@WITTENTECH.COM

15 December 2002

Maclyn Burns
VP, Operations

Dear "JB",

This letter is to inform you of the Company's intention to present you with a new employment agreement, to be effective in 2003. In the interim, the terms of your current letter agreement with the company, dated 1 February 2000, will remain in effect.

Sincerely,

*(signature)*

Michael Oristaglio

# WITTEN
TECHNOLOGIES INC

MICHAEL ORISTAGLIO
PRESIDENT

295 HUNTINGTON
AVENUE
SUITE 203
BOSTON, MA
02115

PHONE 617 236 0019
FAX 617 236 0032
WWW.WITTENTECH.COM
INFO@WITTENTECH.COM
M.ORISTAGLIO
@WITTENTECH.COM

15 December 2002

Anthony DeRubeis
VP, Operations

Dear Tony,

This letter is to inform you of the Company's intention to present you with a new employment agreement, to be effective in 2003. In the interim, the terms of your current letter agreement with the company, dated 1 February 2000, will remain in effect.

Sincerely,

*[signature]*

Michael Oristaglio

# Exhibit 4

Products   Applications   What's New   Service Providers   Contact Us   Home
Systems   Antennas   Software

**Products**

SIR-20   SIR-3000   StructureScan   UtilityScan   RoadScan   BridgeScan   HandyScan

## Data Acquisition Systems

### SIRveyor SIR-20

GSSI introduces the next generation in GPR!

The new SIRveyor SIR-20 is the first in a new generation of GPR data acquisition systems. The SIR-20 combines a rugged, powerful data collection unit and a laptop PC with GSSI's Windows-based RADAN post-processing software.



SIR-20 brochure & specifications
(Adobe Acrobat pdf)

Data collection with the SIR-20 is extremely user-friendly. The flexibility of GSSI SIR systems allows the use of our full product line of antennas for maximum range in depth penetration.

*Want more information? Please feel free to Contact Us.*

The SIR-20 allows the operator to collect data in single line mode or collect data specifically for 3D format, making data processing quick and easy.



- Multi-channel data collection
- Integrated data collection and post-processing for instant results
- Provides 3D imaging
- Controlled by ruggedized notebook computer running Windows 2000™
- System is ideal for surveys of highways, bridges and other multi-channel applications
- GPS compatible



3D QuickDraw data example showing pipes at a depth of 1m.

*RADAN* and the *3D QuickDraw* module enables the user to enhance GPR data to its full potential. This software overcomes the obvious limitations of the common form of GPR data analysis, the 2D cross-section. 3D display has the advantage of looking at the entire survey area at once.

The ability of seeing GPR data as 3D cubes enables a more intuitive approach to data analysis and interpretation. Multiple viewing options allow the user to move around in the data, many time revealing features not visible in traditional vertical data profiles.

Products | Applications | What's New | Contact Us | Home



Products　Applications　What's New　Service Providers　Contact Us　Home
　　Systems　　Antennas　　Software

**Products**

RADAN　　Free Utilities　　Software Updates

## RADAN 5.0 for Windows

### The World's Most Advanced GPR Data Processing Software
### Just Got Better!

RADAN 5.0 is packed with new features that make data processing faster and easier than ever before.

- Display multiple profiles on the screen for comparative interpretation.
- Paste data into reports via the clipboard and print using a variety of printers and plotters supported by Windows drivers.
- RADAN for Windows will make your presentation more dynamic and informative because you have full control over all presentation parameters.
- Will process data from all major brands of GPR instruments

RADAN's modular design has always let you select the processing functions best suited to your needs. Now RADAN for Windows has application-specific add-on modules with more new features and capabilities:

- *QuickDraw Super 3D Module*
- *InterActive 3D - New*
- *Structure Identification Module*
- *Advanced Road Structure Assessment Module*
- *Bridge Assessment Module*

### QuickDraw Super 3D Module

This add-on module features 3-D presentations of data with simple manipulations of the entire data "cube" so that it can be "diced and sliced" along various x-y, y-z, or x-z planes.

**New Features:**

- Ability to create multi-segmented "pipes"
- Remap color transform, contrast and gain in real-time
- New improved form for easy assembly of 3D survey data
- **Movie Mode:** Easy control of movie mode in X, Y or Z direction. Automatically "slice" through your data for easy target identification
- **Simulated Borehole tool**

3D display of two layers of rebar mat

*Back to top*



Two layers of rebar mat with GSSI's exclusive Simulated Borehole tool.

### Interactive 3D Module

This module is the newest addition to GSSI's industry-leading GPR post-processing software. The cornerstone of this module is its ability to show multiple, *interactive* views of 2D and 3D data simultaneously. This will provide the user with unparalleled data interpretation capabilities. Note: This module requires QuickDraw Super 3D to operate.

**Features:**

- Multiple interactive views of pipes and other targets picked by user
- Automatic Target and Pipe Recognition. Results generated quickly and automatically into the Interactive 3D window (available soon for Super 3D and StructureScan files)
- Edit targets or pipes (size, color, material)
- Link and unlink picks to form pipes and targets
- Ability to add and delete pipes and targets

See more InterActive 3D data examples (pdf)



Interactive 3D view of wire mesh mat in concrete floor.